# United States Court of Appeals
## For the First Circuit

No. 05-1847

CARMEN L. RODRIGUEZ-GARCIA,

Plaintiff, Appellant,

v.

MUNICIPALITY OF CAGUAS; HON. WILLIAM MIRANDA-MARIN; WILFREDO
PUIG, AS VICE MAYOR OF CAGUAS AND IN HIS PERSONAL CAPACITY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Gustavo A. Gelpi, U.S. Magistrate Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Godwin Aldarondo-Girald, for appellant.
Michael Craig McCall, with whom Luis E. Pabon-Roca, Grisselle
Gonzalez Negron, and Faccio & Pabon Roca, were on brief for the
Municipality of Caguas, William Miranda-Marin and Wilfredo Puig in
their official capacities.
Leticia Casalduc-Rabell, Assistant Solicitor General, with
whom Salvador J. Antonetti-Stutts, Solicitor General, Mariana
Negron-Vargas, Deputy Solicitor General, and Maite D. Oronoz-
Rodriguez, Deputy Solicitor General, were on brief for William
Miranda-Marin and Wilfredo Puig in their personal capacities.

July 31, 2007

**LIPEZ**, <u>Circuit Judge</u>. Appellant Carmen Rodriguez-Garcia, a career employee in the Municipality of Caguas ("the municipality"), claimed that she was transferred from the Public Works Department ("Public Works")[1] to the Office of Federal Funds ("Federal Funds") in violation of the First Amendment and Puerto Rico law. Although she enjoyed the same title and salary in the two positions, Rodriguez-Garcia alleged that the transfer constituted a demotion because she had no significant work responsibilities at Federal Funds. She further alleged that the transfer was intended as retaliation because she complained of improper campaign tactics by the mayor and others in the municipal government, sparking an investigation by the Puerto Rico Office of Ethics ("Ethics Office"). Alternatively, she asserted that the transfer, motivated by her political affiliation, was an act of political discrimination.

Prior to trial, the court granted summary judgment to defendants on the political discrimination claim. At trial, Rodriguez-Garcia proceeded against Mayor Miranda Marin and Vice Mayor Wilfredo Puig in their personal and official capacities on her retaliation claim, arguing that their actions supported liability against the municipality based on their final authority over her transfer. The court dismissed the retaliation claim

_____

[1] The title of this department – which, in Spanish, is "Limpieza, Ornato y Urbanismo" – is variously translated by the parties as "Beautification," "Ornate," "Cleaning, Beautification and Urbanism," and "Public Works" (among others). We will refer to it as the Public Works Department ("Public Works").

against Mayor Marin as a matter of law at the completion of appellant's case. Although the jury found Vice Mayor Puig not personally liable, it found the municipality liable on the retaliation claim. Finding this jury verdict inconsistent with Rodriguez-Garcia's theory of the case – that the liability of the municipality was contingent on the personal liability of the mayor or the vice mayor – the district court entered judgment as a matter of law for the municipality.

We affirm in part, reverse in part and remand to the district court for further proceedings. Specifically, we affirm the district court's grant of summary judgment to defendants on Rodriguez-Garcia's political discrimination claim. We also affirm the judgment in favor of Vice Mayor Puig on Rodriguez-Garcia's retaliation claim and the decision of the district court vacating the jury award against the municipality. However, we order a new trial on Rodriguez-Garcia's retaliation claim against Mayor Marin and the municipality because the district court's dismissal of the case against the mayor rested upon an erroneous evidentiary ruling involving the application of Federal Rule of Evidence 408 dealing with "compromise and offers to compromise." That error was not harmless.

**I.**

## A.  Factual Background

   1.  Rodriguez-Garcia's Transfer

Rodriguez-Garcia served as Executive Secretary for the Director of Public Works, Luisa Flores, from 1998 until her transfer in 2000.[2]  In that position, she was required to open all incoming mail and enter it into a log.  In 1999, Flores began receiving tickets to fundraisers and notices of leadership meetings for the Popular Democratic Party ("PDP"), the party to which both the mayor and Flores belonged.  Rodriguez-Garcia suspected that the receipt of this material violated a rule prohibiting the use of government resources to further political campaigns.  Nevertheless, she duly logged the materials and delivered them to Flores.

Rodriguez-Garcia first discussed her concerns with Flores in 1999, but they were ignored.  She then contacted a distant relative, Roberto Carrasquillo, who was a municipal assemblyman for the minority Puerto Rican Independence Party, ("PIP").  He confirmed the merit of her concerns and, with her permission, lodged a complaint with the Ethics Office.  Rodriguez-Garcia was summoned to the Ethics Office to testify concerning her complaint on December 21, 1999, and she complied.

---

   [2] She worked for two previous Directors before Flores and had been a municipal employee since 1992.

-4-

On February 1, 2000, Flores reprimanded Rodriguez-Garcia in front of her co-workers for failing to perform one of her tasks. Rodriguez-Garcia acknowledges that this reprimand was unrelated to her testimony in the Ethics Office investigation. Upset, Rodriguez-Garcia left the office early and did not return to work the next day. Instead, she spent that day resting and on medication.[3] On February 3, she had a heated conversation with Flores about the missed day of work; shortly after that conversation, she passed out and required medical care. Her doctor advised her to rest, which she did until February 18. On that date, Rodriguez-Garcia delivered a copy of her medical release to the Human Resources Office ("Human Resources"). She then went to Vice Mayor Wilfredo Puig's office to discuss the doctor's recommendations and her intention to return to work.

The contents of the conversation between Rodriguez-Garcia and Vice Mayor Puig are hotly contested. According to Rodriguez-Garcia, she told the vice mayor that, despite her doctor's recommendation that she not return to Public Works, she wanted to return because she thought she could work things out with Flores. She testified that Vice Mayor Puig then told her that Flores had showed him a copy of the mail log that Rodriguez-Garcia kept and

_____

[3] Extensive medical testimony at trial established that Rodriguez-Garcia had been prescribed a wide variety of pharmaceuticals over the years to treat recurrent depression and other psychological ills.

that the Ethics Office was investigating the use of municipal resources to distribute political propaganda. Apparently unaware that Rodriguez-Garcia had already testified before the Ethics Office on this matter, Vice Mayor Puig suggested that she would be summoned to testify and asked her what she would say. At trial, Rodriguez-Garcia testified: "I told him that I'd tell the truth. That I'd tell the truth because that was my job." According to Rodriguez-Garcia, Vice Mayor Puig told her that "whatever truth I said could affect him, the Mayor and the party, and I told him that I was very sorry, but that was my job." He then told her that "he could no longer count on me." Vice Mayor Puig recalled a very different conversation. He testified that Rodriguez-Garcia requested a transfer out of Public Works and that there was no discussion of the Ethics Office investigation.

Shortly after this meeting, Rodriguez-Garcia was transferred out of her position at Public Works. After initial assignment to the Municipal Education Department, where she had no work to do, she was transferred to Federal Funds. Rodriguez-Garcia claims she did "very little, practically nothing," at Federal Funds because the office already had an Executive Secretary; she alleges that this lack of work was intended to encourage her to quit municipal employment altogether. Rodriguez-Garcia testified that the lack of work made her feel "bad," "uncomfortable," "ashamed," and "depressed," and that it affected her home life: "I locked

myself in, within that problem, and I couldn't see beyond [it]. . . . and I forgot that the kids were growing up, that I had a husband, a mom, a family, and that became my life as a whole." In contrast, the Director of Federal Funds, Gilberto Charriez, testified that his office was understaffed and desperate for workers when Rodriguez-Garcia arrived and that she seemed happy in her new position. He also described ordering pizza on busy work nights when Rodriguez-Garcia stayed late with the rest of the staff to meet deadlines, lunches eaten together in a conference room, office Christmas parties and meeting Rodriguez-Garcia's family outside of work on social occasions.

2. Attempts at Reinstatement

Following her transfer, Rodriguez-Garcia sent a letter to Human Resources dated March 3, 2000, requesting a written explanation for her transfer.[4] Her attorney, Eladio Cartagena, followed up on this first letter with three additional letters. The first of these, dated March 8, was directed to the mayor. This letter requested Rodriguez-Garcia's reinstatement to Public Works and suggested that her transfer was motivated by the Ethics Office investigation. Cartagena received a reply from Human Resources dated March 27 that began, "The Hon. William Miranda Marín, Mayor, has referred to us your letter dated March 8, 2000 concerning the

_____

[4] The letter indicates that a copy was also sent to Mr. Armando Melendez at Human Resources.

transfer of Mrs. [Rodriguez-Garcia]," and stated that: (1) the transfer had been made at Rodriguez-Garcia's request because of differences she had with her direct supervisor; (2) it was considered a temporary transfer; and (3) that "we would have no inconvenience in newly reinstating Mrs. [Rodriguez-Garcia] to her former position." Cartagena sent a second letter to the mayor on April 10, requesting the offered reinstatement.[5] Receiving no response, he penned a third letter on May 31 informing the mayor that, on the basis of the offered reinstatement, Rodriguez-Garcia had met with the interim Human Resources director and the director of Public Works and that they had refused to reinstate her. The May 31 letter also notified the mayor of Rodriguez-Garcia's intention to file a civil action based on Mayor Marin's failure to reinstate her.[6]

Sometime thereafter, Rodriguez-Garcia happened upon the mayor in a public square, where she approached him and asked about the resolution of her complaint. According to Rodriguez-Garcia's testimony, she "grabbed him strongly" and asked about her case. He

_____

[5] The letter indicates that a copy was also sent to Mr. Heriberto Martinez, Director of the Legal Advisor's Office.

[6] For convenience, the three letters written by Rodriguez-Garcia's attorney and sent on her behalf and dated March 8, April 10 and May 31 and the letter from Human Resources dated March 27 will be referred to hereinafter as "the Letters." We distinguish these four letters from any other correspondence related to Rodriguez-Garcia's claims because, as we will discuss, they were the subject of a contested evidentiary ruling.

-8-

responded "what was my case, what was happening?" Before she could elaborate, she was escorted back to her office by his assistants. Finally, on June 21, 2001, Rodriguez-Garcia wrote to the mayor again, complaining that she lacked significant work responsibilities and was depressed; she entreated him to resolve her complaint and reinstate her to her former position. Rodriguez-Garcia was never reinstated to her position at Public Works.[7]

In his testimony as part of the defendants' case, Vice Mayor Puig maintained that he was never informed that Rodriguez-Garcia opposed her transfer after their initial meeting, where he says she requested the change. He was asked: "there are many documents stating that Ms. Rodriguez did not want the transfer, did you know that?" He replied: "They never came to my attention, none of them, stating that she did not want to go."

Armando Melendez, an executive in Human Resources who had met with Rodriguez-Garcia at Vice Mayor Puig's behest, testified that Rodriguez-Garcia expressed her desire not to be transferred during their meeting; however, she called later that same day and said she did want the transfer. Melendez's written report on this

_____

[7] However, in April 2003, Rodriguez-Garcia was transferred to the Department for Conservation of Buildings and, shortly thereafter, she secured a position as an executive secretary in the Technical Services Division for Maintenance and Energy. She testified that she was happily employed in both of these positions.

meeting, dated February 22, 2000, and submitted as evidence at the trial, supports his testimony.[8]

Finally, Heriberto Martinez, who was director of the Legal Advisor's Office at the time of the transfer, testified that, upon Rodriguez-Garcia's request, he contacted Human Resources to look into her case. In a conversation with Melendez, Martinez was led to believe that Rodriguez-Garcia would be reinstated to her position. Martinez also spoke directly with Vice Mayor Puig, who reiterated that Rodriguez-Garcia had requested her initial transfer. When Martinez reported to Rodriguez-Garcia what he had been told, she reiterated that she wanted to return to Public Works. Rodriguez-Garcia's counsel pressed Martinez on whether Rodriguez-Garcia had said that she did not request the initial transfer, but Martinez would testify only to her statement that she wanted to return to Public Works.

Thus, there is a direct conflict between Rodriguez-Garcia's testimony and the account of the defendants. According to her, she never requested a transfer, and the transfer that was imposed upon her, to an office where she had no responsibilities, was in retaliation for her complaint to the Ethics Office. According to Vice Mayor Puig, Rodriguez-Garcia requested a transfer, supposedly because of her conflict with Flores, and that

_____

[8] It states: "Mrs. Rodriguez states she does not want to be transferred; however, during the afternoon she contacts us and tells us she has thought it over and does want the transfer."

was the last he heard of her employment predicament. According to Melendez, Rodriguez-Garcia initially requested not to be transferred but later called and requested a transfer. Furthermore, according to her supervisor at Federal Funds, Rodriguez-Garcia joined a busy office that was short-staffed at the time of her transfer and where there was plenty of work to keep her busy.

## B. Procedural Background

In October 2000, Rodriguez-Garcia filed a petition in the Superior Court of Puerto Rico seeking an injunction against the municipality and Luisa Flores, alleging that she had been transferred in retaliation for her Ethics Office complaint, in violation of Puerto Rico law.[9] Rodriguez-Garcia later filed and was granted a voluntary dismissal without prejudice. On November 7, 2001, she filed a new action in federal court against the municipality, Mayor Marin and Vice Mayor Puig, claiming that she had been transferred and demoted on the basis of her political affiliation ("the political discrimination claim") and her involvement in the Ethics Office investigation ("the retaliation claim"), in violation of the First Amendment and Puerto Rico law.

_____

[9] The petition was later amended to include a political discrimination claim under the First Amendment; the amended petition did not include Flores as a defendant, as she had died in the interim.

She brought her federal law claims under 42 U.S.C. §§ 1981, 1983 and 1985.

Defendants moved for summary judgment on a number of grounds. In an August 2004 opinion and order, the district court granted the motion in part and denied it in part.[10] In particular, the court found that Rodriguez-Garcia had not established a prima facie case of political discrimination under the First Amendment and that her claims under §§ 1981 and 1985 were inapt because she had not alleged any discriminatory action based on race or class.[11] However, the district court found that Rodriguez-Garcia had placed sufficient facts in dispute to warrant a jury trial on the retaliation claim and that these factual disputes foreclosed a ruling at that stage on the mayor's and vice mayor's claimed

---

[10] Defendants previously had moved for summary judgment on several grounds, including that the statute of limitations had run. The district court granted the motion on that basis, but we vacated the decision in January 2004 and remanded the case for further proceedings. See Rodriguez-Garcia v. Municipality of Caguas, 354 F.3d 91 (1st Cir. 2004).

[11] 42 U.S.C. § 1981 states, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Section 1985(3) provides a damages remedy in the event that "two or more persons . . . conspire . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws." The court found that Rodriguez-Garcia's claim did not fit within the language of either statutory section. Rodriguez-Garcia does not appeal these rulings.

entitlement to qualified immunity. Motions and cross-motions for reconsideration were filed and denied.

Before the trial commenced, defendants filed a motion in limine to exclude the testimony of several witnesses and the Letters under Federal Rule of Evidence 408, which excludes "conduct or statements made in compromise negotiations regarding" a "claim that was disputed." Fed. R. Evid. 408(a)(2), (a). The court denied the motion as to the testimony and allowed the Letters into evidence, but only "for the limited purpose of negating defendants' contention that plaintiff herself requested a transfer."

At the close of the plaintiff's case, Mayor Marin requested and was granted judgment as a matter of law in his personal capacity under Federal Rule of Civil Procedure 50(a). Noting that the Letters could not be relied upon as evidence of the mayor's notice of her claim because of the limited ground of their admission, the court explained that the remaining evidence, "[a] mere letter of protest and request [to Human Resources] for investigation which [was] ignored by a supervising authority,"[12] was insufficient as a matter of law to establish that the mayor knew of Rodriguez-Garcia's employment situation and thus he could not be

---

[12] The court is referring to Rodriguez-Garcia's March 3 letter to Human Resources requesting a written explanation for her transfer. This letter was not excluded under the court's Rule 408 ruling.

-13-

found liable for any participation in her transfer and lack of reinstatement.

At the trial's conclusion, the jury rejected Rodriguez-Garcia's claim that Vice Mayor Puig had taken an adverse employment action against her. However, it did find that she had established municipal liability for that adverse employment action and awarded her $285,000.00 in damages. In response to the municipality's motion, the court granted judgment as a matter of law under Federal Rule of Civil Procedure 50(b), finding the jury's verdict inconsistent with Rodriguez-Garcia's theory of the case. The court denied Rodriguez-Garcia's motion to vacate judgment and, alternatively, for a new trial, and she proceeded with this appeal.

Rodriguez-Garcia challenges each of the district court's dispositive rulings: (1) the grant of summary judgment for defendants on her political discrimination claim; (2) the grant of the Rule 50(a) motion dismissing the case against Mayor Marin in his personal capacity; and (3) the decision to grant judgment as a matter of law to the municipality. She also challenges the jury verdict in favor of Vice Mayor Puig. With respect to the municipality, she contends that either the jury verdict should be restored or that she is entitled to a new trial on her claim against Mayor Marin, Vice Mayor Puig and the municipality. She insists that the verdict in favor of Vice Mayor Puig was against the weight of the evidence.

-14-

## II.

## A.  The Political Discrimination Claim

We review the grant of summary judgment on the political discrimination claim de novo, drawing all reasonable inferences in favor of Rodriguez-Garcia.  Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 25 (1st Cir. 2006).  As a necessary element of establishing a prima facie case of political discrimination, a plaintiff must show that party affiliation or advocacy of political ideas was a substantial or motivating factor behind the challenged employment action.  Pequero-Moronta v. Santiago, 464 F.3d 29, 45 (1st Cir. 2006).

The district court granted summary judgment to defendants because it found that "plaintiff's fluid political affiliation makes it difficult for the Court to find that defendants were well aware and motivated by her alleged support for the [party in opposition to the mayor's party]."  Indeed, Rodriguez-Garcia testified at her pre-trial deposition that, while she claims to be a member of the PIP, she voted for candidates from several parties in the 2000 elections.[13]  She also admitted that she acted as an electoral college official for the mayor's party, the PDP, in the 1996 elections.

---

[13] We limit our review to the record as it stood before the district court when it granted summary judgment. See J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1250 (1st Cir. 1996).

-15-

On appeal, Rodriguez-Garcia does not contest the court's characterization of her partisan affiliation; rather, she attempts to shift the basis of her political discrimination claim from political affiliation to political speech. However, this attempt at recharacterization makes her political discrimination claim indistinguishable from her retaliation claim, which focuses on the defendants' reaction to her discussions with the Ethics Office. As presented to the district court at the time of its summary judgment ruling, her political discrimination claim was dependent upon establishing that defendants were aware of and motivated by her political affiliation. We agree with the district court that the plaintiff did not establish a genuine issue of material fact on the relationship between her transfer and her political affiliation. We therefore affirm the district court's grant of summary judgment for defendants on this claim.

## B. Reinstatement of the Jury Verdict

Rodriguez-Garcia urges us to reinstate the jury's verdict against the municipality, arguing that the court erred when it found the verdict inconsistent with her theory of the case. The district court characterized Rodriguez-Garcia's case as depending on retaliation taken against her by Mayor Marin and Vice Mayor Puig, as parties with "final authority" to bind the municipality. Since the claim against the mayor had already been dismissed, the court viewed municipal liability as contingent upon Vice Mayor

Puig's liability. Therefore, the jury's rejection of the claim against Vice Mayor Puig made municipal liability inconsistent with Rodriguez-Garcia's theory of the case.

On appeal, Rodriguez-Garcia argues that the jury could have based municipal liability on the actions of a conspiracy of municipal workers, including but not limited to Vice Mayor Puig. Seen through the lens of this alternative theory, the jury's verdicts are not necessarily inconsistent, and the judgment against the municipality should be reinstated.[14]

The municipality argues that Rodriguez-Garcia's failure to object to the judge's inconsistency determination before the jury was dismissed bars our review of this issue. We agree. We have followed an "iron-clad rule" that a party that fails to raise an objection based on verdict inconsistency before the jury is dismissed waives the issue. See <u>Wennik</u> v. <u>Polygram Group</u>

---

[14] Although it is not entirely clear, Rodriguez-Garcia's brief also could be read to allege a theory of liability arising from the municipality's general custom or practice of retaliating against workers who voice complaints against the mayor's party. Her brief cites <u>Monell</u>, 436 U.S. at 691, which holds that municipalities can be found liable under 42 U.S.C. § 1983 when either official policy or "'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels" operates to deprive a plaintiff of her constitutional rights. Such a theory was not developed in the district court and therefore is not available on appeal. At trial, the court specifically stated: "In the pre-trial, I don't have any theory of the plaintiff's that could establish liability against the Municipality that there was a previous pattern, and the Municipality was engaged . . . . That's not a theory that is stated here." Rodriguez-Garcia agreed.

-17-

<u>Distribution, Inc.</u>, 304 F.3d 123, 130 (1st Cir. 2002); <u>Campos-Orrego</u> v. <u>Rivera</u>, 175 F.3d 89, 98 (1st Cir. 1999); <u>Toucet</u> v. <u>Mar. Overseas Corp.</u>, 991 F.2d 5, 8 (1st Cir. 1993) (collecting cases). Here we confront the opposite situation: Rodriguez-Garcia failed to specifically voice her opinion that the verdict was consistent before the jury was dismissed.

In the typical case, it would be pointless to require a party to assert that a favorable verdict was consistent. However, this is not the typical case. Here, the district court had twice indicated that, if the jury found Vice Mayor Puig not liable and the municipality liable, it would enter judgment for the municipality as a matter of law.

First, after the jury instructions were read, the defense noted that the instructions did not preclude the jury from finding in favor of Vice Mayor Puig but against the municipality. The court responded: "If they don't find [Vice] Mayor Puig liable and for some reason they find the municipality liable . . . the municipality is not liable." Rodriguez-Garcia did not object to this statement at the time; she also failed to object to this statement shortly thereafter, when specifically asked if she had objections to preserve.

Second, after closing arguments, the court gave the parties an opportunity to "represerve" their earlier objections. The defense again raised its concern that the jury instructions

allowed for a mixed verdict. The court responded: "Okay, but I told you that if for all purposes they find Mr. Puig not liable, as a matter of law I am going to have the municipality dismissed. So that is not going to be a problem." The defense then stated: "I understand, Your Honor, and I think that we all agree with that matter, the parties agree, the plaintiff agreed also, so no problem." Rodriguez-Garcia again raised no objection on this point, though she preserved other objections.

After the verdict was delivered and the jurors were duly polled, Rodriguez-Garcia again remained silent. The court discharged the jury and then declared that it would enter judgment for the municipality. Although Rodriguez-Garcia finally tried to argue that the jury verdict was consistent, it was too late. By failing to preserve an objection to the court's inconsistent verdict determination before the jury was discharged, Rodriguez-Garcia has waived her right to argue on appeal that the court erred in that determination. See Torres-Arroyo v. Rullan, 436 F.3d 1, 6 (1st Cir. 2006) (finding failure to object before the moment of jury discharge constituted a waiver); Correia v. Fitzgerald, 354 F.3d 47, 57 (1st Cir. 2003) (holding that a failure to object to an alleged inconsistency while the jury is still empaneled constituted waiver).

## C. Arguments for a New Trial

Rodriguez-Garcia argues that, in the event we decline to reinstate the verdict against the municipality, we should grant her a new trial against all parties, claiming that the district court erred in dismissing the claims against Mayor Marin and that a new trial is warranted against Vice Mayor Puig because the jury verdict in his favor was against the weight of the evidence.

### 1.  Dismissal of the Case Against Mayor Marin

The court dismissed the claims against Mayor Marin in his personal capacity, finding that, while the "Mayor can in principle be held liable under a theory of failing to act or take necessary steps to remedy [her] predicament," Rodriguez-Garcia had not provided sufficient evidence to establish that the mayor was aware of her situation.  Municipal officials may only be held liable under § 1983 in their personal capacity if the plaintiff can establish that her constitutional injury resulted from the direct acts or omissions of the official, or from indirect "conduct that amounts to condonation or tacit authorization."  Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005).  On either theory, the plaintiff must show that the official had actual or constructive notice of the constitutional violation.  See Lipsett v. Univ. of P.R., 864 F.2d 881, 902 (1st Cir. 1988) ("An important factor in making the determination of liability is whether the official was put on some kind of notice of the alleged violations,

-20-

for one cannot make a 'deliberate' or 'conscious' choice to act or not to act unless confronted with a problem that requires the taking of affirmative steps." (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986))).

In seeking to convince the court that the mayor knew of her employment situation, Rodriguez-Garcia relied principally on the Letters, particularly the March 27 letter from Human Resources suggesting that the mayor had referred her claim to its attention. Rejecting this argument, the court noted that it had admitted the Letters for the limited purpose of establishing that Rodriguez-Garcia did not request a transfer from Public Works and thus the Letters could not be used to establish the mayor's knowledge of her situation. With the Letters excluded, the court found that the remaining evidence was insufficient to establish that the mayor was aware of her situation and hence had any direct or indirect involvement in her transfer, lack of reinstatement, or minimal work assignments.

We review the court's Rule 50(a) ruling de novo, viewing the evidence in the light most favorable to Rodriguez-Garcia. DiRico v. City of Quincy, 404 F.3d 464, 468 (1st Cir. 2005). However, because that ruling depends upon the correctness of the court's decision to limit the admissibility of the Letters, we must first evaluate the court's evidentiary ruling, which we review for

abuse of discretion.  See Pelletier v. Main St. Textiles, LP, 470
F.3d 48, 52 (1st Cir. 2006).

a.  Admission of the Letters for a Limited Purpose

In their motion in limine, appellees argued that the
Letters should be excluded under Federal Rule of Evidence 408,
which prohibits the use of "statements made in compromise
negotiations regarding the claim" as evidence of a party's
"liability for . . . a claim that was disputed as to validity or
amount."  Fed. R. Evid. 408(a)(2), (a).  At a hearing on the
motion, the court initially stated:

> [I]t is my impression that these do not fall
> under Rule 408. . . .  These are the sort of
> letters that when anything happens regarding
> personnel, the attorney starts to write the
> agency to put them on notice.  The agency, the
> municipality in this case, will respond,
> 'We've noted your letter.  We are going to
> look into this.'  Then . . . the attorney will
> say, 'Oh, you have done this or you haven't
> done that.'

Although the court seemed inclined to reject defendants' arguments
that the Letters were covered by Rule 408, Rodriguez-Garcia's
attorney began her arguments against the motion in limine by
focusing on an exception to Rule 408 that allows evidence offered
for a purpose other than showing liability.  Specifically, she
argued that "[t]he letters [were] being introduced into evidence
for the limited purpose of proving that defendants in fact knew
that Ms. Rodriguez[-Garcia] did not want the transfer and that they
were aware that she did not want the transfer."

Despite this inauspicious beginning, Rodriguez-Garcia's attorney's arguments developed over the course of the hearing on the motion. By the end, she clearly contested the relevance of Rule 408 to the Letters. Indeed, just before the court announced that it would recess to deliberate, her attorney urged the court to examine the four Letters together:

> You cannot look at each letter individually . . . . You see, Mr. Cartagena directed a letter to the mayor. And the mayor, and very wisely by his counsel, is trying to take himself out of the picture saying it has nothing to do with me, I didn't exercise any action, I didn't do anything, I didn't sign the letter, I didn't send the letter. But you read [the letter from Human Resources], the first thing that it says is, 'The Honorable William Miranda Marin, Mayor, has referred to us your letter dated March 8, 2000, concerning the transfer of Ms. Rodriguez.' This is evidence of liability against the mayor. (Emphasis added).

Defense counsel responded: "That's why [Rule] 408 does not permit the letter to come into evidence." Rodriguez-Garcia's attorney countered: "This letter is not an admission . . . . It is not a compromise. Read it." Thus, by the end of the hearing, the court was on notice that Rodriguez-Garcia intended to use the Letters as proof of the mayor's liability and not merely as evidence that she did not request her transfer. Nonetheless, in a written ruling after the recess, the court "[a]ssume[d] that the communications at issue [were] indeed compromise related" and it admitted the Letters

"for the limited purpose of negating defendants' contention that plaintiff herself requested a transfer."

This limitation, erroneous as a matter of law, was an abuse of discretion.  See Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 158 (1st Cir. 2004) (noting that legal error always constitutes abuse of discretion).  The court's initial impression that these letters do not fall under Rule 408 was correct.  These Letters cannot reasonably be viewed as "statements made in compromise negotiations regarding [a] claim" that was in dispute.  Fed. R. Evid. 408(a)(2).  The March 8 letter from Rodriguez-Garcia's attorney to the mayor's office served the purpose of giving the defendants notice of a claim.  Indeed, appellees acknowledged that Rodriguez-Garcia's attorney had to write such a letter to comply with local pre-litigation notice requirements.  The March 27 letter from Human Resources, which said that "The Hon. William Miranda Marín, Mayor, has referred to us your letter dated March 8, 2000 concerning the transfer of Mrs. [Rodriguez-Garcia]," simply acknowledged that notice of the claim had been received and expressed the willingness of Human Resources to grant Rodriguez-Garcia's request for reinstatement.

Although Human Resources disputed a factual matter (that Rodriguez-Garcia had not requested a transfer), that disagreement did not affect their willingness to grant to her, without qualification or condition, the reinstatement that she sought.

-24-

With Rodriguez-Garcia receiving in this letter exactly what she wanted, it could easily be thought there were no "compromise negotiations" taking place in this exchange of correspondence within the meaning of Rule 408. See, e.g., Merriam-Webster's Collegiate Dictionary 984 (10th ed. 1998) (defining "compromise" as "a settlement of differences . . . reached by mutual concessions."); see also Sandlin v. Shapiro & Fishman, 919 F. Supp. 1564, 1569 (D. Fla. 1996) (finding that letters whose contents offered no concessions did not meet the definition of "compromise" and thus were outside the scope of the state analog to Rule 408). Relatedly, the statement at issue here ("The Hon. William Miranda Marin, Mayor, has referred to us your letter dated March 8, 2000, concerning the transfer of Mrs. Rodriguez") is not the kind of statement that one would be reluctant to make to a potential adversary in an effort to reach an agreement about a dispute without the protection of Rule 408. Indeed, if a stand-alone letter of acknowledgment had been written confirming receipt and noting that the mayor's office had referred the claim to Human Resources, there is no question that the letter would have been admissible as evidence of notice to the mayor of Rodriguez-Garcia's claim. Thus, admitting this evidence complies with both the letter and spirit of Rule 408.

The second letter from Rodriguez-Garcia's attorney to the mayor, dated April 10, simply reiterated the request for the

-25-

transfer.  When no reinstatement was forthcoming, her attorney sent a third letter dated May 31, 2000 announcing his intention to file a lawsuit.  These letters too are outside the ambit of Rule 408.  Therefore, Rodriguez-Garcia should have been permitted to use the Letters as evidence that the mayor personally had notice of her claims, an indispensable element of her theory of liability, rather than simply as evidence that she had not requested a transfer from Public Works.

           b.  Harmless Error

           It is a short step from the determination that the district court erred in its decision to limit the admissibility of the Letters to a determination that it erred in granting the mayor judgment as a matter of law.  The district court, having excluded the Letters, determined that the remaining evidence – the March 3 complaint letter Rodriguez-Garcia sent to Human Resources[15] and the encounter between Rodriguez-Garcia and the mayor in a public square – was insufficient to establish supervisory liability.  The court explained: "'[i]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that [§] 1983 does not impose respondeat superior liability.'" (quoting Johnson v. Wright, 234 F.

---

[15] While the March 3 letter indicated that a copy was sent to the vice mayor, it does not mention the mayor.

-26-

Supp. 2d 352, 363 (S.D.N.Y. 2002)). Given the state of the record that prompted this observation, we understand the court's reference to the "mere receipt of a letter" to be a reference to the March 3 letter to the acting director of Human Resources.

We appreciate the reluctance to permit a jury to draw an inference about the personal involvement of the mayor on the basis of a letter sent to a department head. However, if the court had correctly admitted the Letters as evidence of the mayor's knowledge of Rodriguez-Garcia's complaint and his personal involvement in dealing with it, the court could no longer maintain that Rodriguez-Garcia was attempting to establish the mayor's liability based simply on his role as the supervisor of a department head. Instead, she would have had a basis for arguing that the mayor knew about and was directly involved in the disposition of her transfer and the failure to remedy it. Although appellees argue strenuously that there was no evidence that the mayor personally received the Letters sent to him, this is a factual question appropriate for jury determination.

Moreover, because the district court erred in dismissing the case against the mayor in his personal capacity, it also improperly hindered Rodriguez-Garcia's case against the municipality. It is well established that the deliberate acts or omissions of a municipal policymaker with final authority over the subject matter in question may expose the municipality itself to

-27-

liability. See Pembaur 475 U.S. at 481-83 (explaining that municipal liability can be found on a plaintiff's showing of a "deliberate choice to follow a course of action [] made . . . by the official or officials responsible for establishing final policy with respect to the subject matter in question"). We have repeatedly recognized that "mayors in Puerto Rico are the government officials ultimately responsible for the employment decisions of the municipality." Rivera-Torres v. Ortiz Velez, 341 F.3d 86, 103 (1st Cir. 2003); see also Cordero v. De Jesus-Mendez, 867 F.2d 1, 7 (1st Cir. 1989). If Rodriguez-Garcia could establish the mayor's liability in his personal capacity, she would have a plausible argument for municipal liability as well. Under these circumstances, the limited relevance accorded by the district court to the Letters on the basis of Rule 408 was not a harmless error.

2.  The Verdict in Favor of Vice Mayor Puig

Rodriguez-Garcia also urges us to overturn the verdict in favor of Vice Mayor Puig, arguing that the jury could not have made a credibility determination in favor of Vice Mayor Puig given the weight of the evidence suggesting that Rodriguez-Garcia had consistently opposed her transfer. We disagree.

The question of Vice Mayor Puig's liability turned largely on whether the jury credited Vice Mayor Puig's or Rodriguez-Garcia's testimony concerning the conversations that

-28-

allegedly took place between them.  Indeed, Rodriguez-Garcia's closing argument featured a series of rhetorical questions, asking:

> Who do you believe? You heard Carmen, but no, the Vice Mayor tells us that on February 18th Carmen Rodriguez requested a transfer to Federal Funds.  Who hears him?  Who remembers? . . . Who do you believe?  . . . Shall we believe Wilfredo Puig, who very conveniently remembers that Carmen requested to go to Federal Funds . . . Should we believe Wilfredo Puig, that conveniently understood that Carmen had no hospitalizations after getting to Federal Funds? . . . Who will we believe? Wilfredo Puig, who again, understood that he could testify as to assigned personnel action, that he later stipulated that did not exist, and that he later admitted that he had never seen.  Who do we believe?  What happened on February 18th, what?

Assessing witness credibility is "within the unique province of the jury."  United States v. Thomas, 467 F.3d 49, 55 (1st Cir. 2006). We will not disturb its verdict in favor of Vice Mayor Puig.

### III.

For the reasons set forth above, we affirm the district court's grant of summary judgment for defendants on Rodriguez-Garcia's political discrimination claim.  We also reject Rodriguez-Garcia's request that we order reinstatement of the verdict against the municipality, concluding that Rodriguez-Garcia failed to make the necessary objection before the jury was discharged.  However, we find that the court erred when it dismissed the case against the mayor based on its Rule 408 ruling limiting the use of the Letters

that were so critical to Rodriguez-Garcia's case. We therefore grant Rodriguez-Garcia's request for a new trial against the mayor and, because municipal liability may be premised upon the mayor's liability, against the Municipality of Caguas, as well. Finally, we decline to disturb the jury's verdict in favor of Wilfredo Puig.

Affirmed in part, reversed in part, and remanded for further proceedings. The parties shall bear their own costs.