WYNN, Circuit Judge,
concurring:
Because Tuomey opened the door to the admission of Kevin McAnaney’s testimony by asserting an advice of counsel defense, and because I cannot say, based on the record before me, that no rational jury could have determined that Tuomey violated both the Stark Law and the False Claims Act, I concur in the outcome today.
But I write separately to emphasize the troubling picture this case paints: An impenetrably complex set of laws and regulations that will result in a likely death sentence for a community hospital in an already medically underserved area.
I.
Regarding the issue of whether the district court correctly granted a new trial, we review such a decision for abuse of discretion. Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir.1998). Similarly, we “review a trial court’s rulings on the admissibility of evidence for abuse of discretion,” and we will overturn such a ruling only if it is “arbitrary and irrational.” United States v. Cole, 631 F.3d 146, 153 (4th Cir.2011) (quotation marks and citation omitted).
A.
Judge Perry, who presided over the first trial, excluded McAnaney’s testimony pursuant to Evidence Rule 408, which can be used to exclude evidence of settlement negotiations. Under Rule 408, “conduct or a statement made during compromise negotiations about [a disputed] claim” is generally inadmissible when used to “prove or disprove the validity or amount of a disputed claim.” Fed.R.Evid. 408(a).
It is unclear to me that the district court abused its discretion in determining that McAnaney’s testimony could be excluded under Rule 408. In his deposition testimony, McAnaney described himself as “a tie breaker” who was jointly hired by Drake-ford and Tuomey when they could not agree about whether the contracts violated the Stark Law — arguably a disputed claim. J.A. 139-41. Tuomey’s and Drakeford’s dispute about the legality of the contracts reached impasse arid ended in Drakeford acting as a relator of this qui tarn action only three months later. Had Drakeford and Tuomey been able to reach an agreement, Drakeford presumably would not have filed this suit, in which the government, having intervened, now stands in Drakeford’s shoes.
Rule 408’s exclusionary provision applies where a “dispute or a difference of opinion exists,” not just “when discussions crystallize to the point of threatened litigation.” Affiliated Mfrs., Inc. v. Aluminum Co. of Am., 56 F.3d 521, 527 (3d Cir.1995). When viewed thusly, it is hard to say that Judge Perry acted either arbitrarily or irrationally in deeming McAnaney’s testimony excludable.
Crucially, however, evidence subject to exclusion under Rule 408 is so excludable “only if the evidence is offered to prove *391 either liability for or invalidity of a claim or its amount;” otherwise, it may come in. Bituminous Const., Inc. v. Rucker Enterprises, Inc., 816 F.2d 965, 968 (4th Cir.1987) (emphasis added); Fed.R.Evid. 408(b) (“The court may admit this evidence for another purpose.”). Stated differently, “[s]ince the rule excludes only when the purpose is proving the validity or invalidity of the claim or its amount, an offer for another purpose is not within the rule.” 2-408 Weinstein’s Fed. Evid. § 408.08 (quotation marks and citation omitted). Therefore, if the McAnaney evidence was admissible for a purpose beyond the validity or amount of a disputed claim, Rule 408 would provide no basis for barring it wholesale from the first trial.
B.
The government argues, among other things, that the McAnaney evidence went to the heart of an issue wholly beyond the scope of Rule 408’s limited exclusionary ambit — namely, Tuomey’s advice of counsel defense. With this, I must agree.
As explained by a district court in this Circuit in the context of a False Claims Act fraud claim, “good faith reliance on the advice of counsel may contradict any suggestion that a [defendant] ‘knowingly’ submitted a false claim.” United States v. Newport News Shipbuilding, Inc., 276 F.Supp.2d 539, 565 (E.D.Va.2003). “[I]f a [defendant] seeks the advice of counsel in good faith, provides full and accurate information, receives advice which can be reasonably relied upon, and, in turn, faithfully follows that advice, it cannot be said that the defendant ‘knowingly’, submitted false information or acted with deliberate ignorance or reckless disregard of its falsity, even if that advice turns out in fact to be false.” Id. See also, e.g., United States v. Butler, 211 F.3d 826, 833 (4th Cir.2000) (identifying the elements of the advice of counsel defense as “(a) full disclosure of all pertinent facts to [a lawyer], and (b) good faith reliance on the [lawyer’s advice”).
When a party raises an advice of counsel defense, however, all advice on the pertinent topic becomes fair game. “It has ... become established that if a party interjects the ‘advice of counsel’ as an essential element of a claim or defense,” then “all advice received concerning the same subject matter” is discoverable, not subject to protection by the attorney-client privilege, and, by logical extension, admissible at trial. 1 McCormick On Evid. § 93 (7th ed.2013). See also, e.g., In re EchoStar Commc’ns Corp., 448 F.3d 1294, 1299 (Fed.Cir.2006) (“Once a party announces that it will rely on advice of counsel ... the attorney-client privilege is waived. The widely applied standard for determining the scope ... is that the waiver applies to all other communications relating to the same subject matter.... Thus, when Ech-oStar chose to rely on the advice of in-house counsel, it waived the attorney-client privilege with regard to any attorney-client communications relating to the same subject matter, including communications with counsel other than in-house counsel, which would include” the advice of outside counsel.) (quotation marks and citation omitted).
Here, there can be no doubt that Tuo-mey pressed an advice of counsel defense. Tuomey argued to the first jury, for example, that “[t]he lawyers were the ones running the show.... All Tuomey did was accept their recommendations and vote on them if they thought that it was something that would be good for the hospital. Advice of counsel is a very, very good defense. It is one that the law recognizes, and it is one that ... fits perfectly in this situation.” Trial I, Transcript for Mar. 25, 2010, at 1986.
Further, the district court instructed the jury on the advice of counsel defense, mak *392 ing clear that it provided a vehicle for absolving Tuomey of Falsé Claims Act liability. The court instructed, among other things, that “the defendant has asserted an affirmative defense of advice of counsel to the United States’ allegation that it acted in violation of the False Claims Act. An affirmative defense is .an argument that, if true, will defeat the government’s claim.” Trial I, Transcript for Mar. 26, 2010, at 2098-99. Regarding what Tuomey needed to show to succeed with that defense, Judge Perry instructed that “in order for the defendant to prevail on its affirmative defense of advice of counsel, Tuomey must prove the following: One, that the advice was sought in good faith; two, that Tuo-mey provided full and accurate information to the attorney; three, the advice could be reasonably relied upon; and, four, Tuomey faithfully followed the attorney’s advice.” Id.
Having put the advice it got from its lawyers squarely at issue, Tuomey should not have been permitted to cherry-pick which advice of counsel the jury was permitted to hear. Instead, the jury should have been allowed to consider all the advice of all Tuomey’s counsel — including McAnaney.
The record makes clear that, whatever else McAnaney’s assessment was, it was also advice of counsel. McAnaney’s engagement letter to Tuomey and Drakeford, who had hired him jointly, stated that McAnaney, a lawyer, had been “retained” to “review and advise” the parties “with respect to a proposed business relationship.” J.A. 145. McAnaney committed to being guided by the parties’ “instructions in carrying out the representation” and reporting to the parties his “conclusions” and “any potential compliance issues.” Id. In other words, McAnaney was Tuomey’s counsel, and he advised Tuomey about the contracts at the heart of this case.
The record makes similarly clear that Tuomey did not follow McAnaney’s advice. McAnaney advised Tuomey that the proposed contracts raised significant “red flags” under the Stark Law. J.A. 2054. McAnaney advised that Tuomey would have difficulty persuading the government that the contracts did not compensate the physicians in excess of fair market value. And McAnaney warned Tuomey that the contracts presented “an easy case to prosecute” for the government. J.A. 2078. Rather than heed this advice and back away from the contracts, however, Tuomey told McAnaney not to put his conclusions in writing and ended his engagement.
Allowing McAnaney’s testimony into evidence to show the advice he gave in light of Tuomey’s advice of counsel defense would have been outside of Rule 408’s limited exclusionary ambit. In other words, by pressing an advice of counsel defense, Tuomey itself opened the door for McAnaney’s testimony to come in, even if it otherwise might have been excludable under Rule 408. See Fed.R.Evid. 408(b). Despite this, the district court barred McAnaney’s testimony wholesale.
In keeping McAnaney out of the first trial, the district court prevented the jury from getting the full picture of what advice Tuomey had gotten from counsel. Tuo-mey told the jury that “[t]he lawyers were the ones running the show ... All Tuomey did was accept their recommendations.” Trial I, Transcript for Mar. 25, 2010, at 1986. But the government was effectively prevented from showing that Tuomey had gotten conflicting recommendations from its different counsel, picked its preferred advice, and discarded the rest. It is hard to imagine that this constituted anything other than a prejudicial abuse of discretion. Cf. Rodriguez-Garcia v. Municipality of Caguas, 495 F.3d 1 (1st Cir.2007) (reversing because erroneous Rule 408 rul *393 ing hamstrung plaintiffs ability to show elements of claim).
In sum, in allowing Tuomey to press its advice of counsel defense and giving the jury an advice of counsel instruction yet preventing the jury from hearing all the advice that Tuomey got, the district court abused its discretion and prejudiced the government. This error alone was grave enough to warrant a new trial. Accordingly, I, too, conclude that Judge Perry’s decision to grant a new trial must be upheld.
II.
Moving beyond the district court’s decision to grant a new trial, I agree with the majority that the jury’s determination that Tuomey violated both the Stark Law and the False Claims Act must stand. Our standard of review at this juncture is a highly deferential one, “according] the utmost respect to jury verdicts” and “constraining” us to affirm so long as the record contains “sufficient evidence for a reasonable jury” to have returned the verdict it did. Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 259 (4th Cir.2001). After careful review of the record, I cannot conclude that no reasonable jury could have reached the verdict before us.
Nevertheless, I am troubled by the picture this case paints: An impenetrably complex set of laws and regulations that will result in a likely death sentence for a community hospital in an already medically underserved area.
A.
The Stark Law is, at its core, a prohibition on self-referrals, barring doctors from referring patients for certain services to entities in which the doctors (or their immediate family members) have a financial interest, unless an exception applies. Patrick A. Sutton, The Stark Law in Retrospect, 20 Annals Health L. 15, 25-26 (2011). Further, entities providing the pertinent services are prohibited from billing Medicare or Medicaid pursuant to such a prohibited referral. Id.
“The Stark Law is a strict liability statute so it is immaterial whether one intended to violate the law; an inadvertent violation can trigger liability.” Paula Tironi, The “Stark” Reality: Is the Federal Physician Self-Referral Law Bad for the Health Care Industry?, 19 Annals Health L. 235, 237-38 (2010). Individuals and entities that violate the Stark Law can be subject to severe monetary penalties and exclusion from federal health care programs. Id. These “steep civil sanctions and program exclusions may be ruinous. Health care providers are open to extensive liability, their financial security resting uneasily upon a combination of their attorneys’ wits [and] prosecutorial discretion.” Jo-Ellyn Sakowitz Klein, The Stark Laws: Conquering Physician Conflicts of Interest?, 87 Geo. L.J. 499, 503-04 (1998).
Despite attempts to establish “bright line” rules so that physicians and healthcare entities could “ensure compliance and minimize ... costs,” 66 Fed.Reg. 856, 860 (Jan. 4, 2001), the Stark Law has proved challenging to understand and comply with. Indeed, “[t]he Stark law is infamous among health care lawyers and their clients for being complicated, confusing and counterintuitive; for producing results that defy common sense, and sometimes elevating form over substance. Ironically, the Stark law was actually intended to simplify life by creating ‘bright lines’ between what would be permitted and what would be disallowed, and creating certainty by removing intent from the equation.” Charles B. Oppenheim, The Stark Law: Comprehensive Analysis + Practical Guide 1 (AHLA 5th ed.2014). Some of the invective used to describe the Stark law even borders on lyrical: “ambiguous[,] ar-eane[,] and very vague;” and “heaps of *394 words in barely decipherable bureau-cratese.” Steven D. Wales, The Stark Law: Boon or Boondoggle? An Analysis of the Prohibition on Physician Self-Referrals, 27 Law & Psychol. Rev. 1, 22-23 (2003) (quotation marks and citations omitted).
Given this complexity and the strict liability nature of the statute, a Stark Law “compliance program can help a physician or [] entity prove good faith and obtain leniency in the event of a violation; however, the Stark Law’s complexity and frequent revisions make it difficult for physicians and entities to develop and implement such programs.” Tironi, supra at 238. Against this problematic backdrop, the availability of an advice of counsel defense should perhaps be especially robust in Stark Law cases prosecuted under the False Claims Act.
B.
The False Claims Act discourages fraud against the federal government by imposing liability on “any person who ... knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.” 31 U.S.C. § 3729(a)(1)(A) (emphasis added). The False Claims Act is meant “to indemnify the government ... against losses caused by a defendant’s fraud,” Mikes v. Straus, 274 F.3d 687, 696 (2d Cir.2001) (citing United States ex rel. Marcus v. Hess, 317 U.S. 537, 549, 551-52, 63 S.Ct. 379, 87 L.Ed. 443 (1943)), as opposed to a defendant’s mistake.
Accordingly, a defendant may skirt False Claims Act liability by showing good faith reliance on the advice of counsel. As the majority opinion recognizes, in fraud cases, “‘[i]f in good faith reliance upon legal advice given him by a lawyer to whom he has made full disclosure of the facts, one engages in a course of, conduct later found to be illegal,’ ” the trier of fact may conclude that the conduct was innocent because “‘the guilty mind’ was absent.” Ante at 380-81 (quoting United States v. Painter, 314 F.2d 939, 943 (4th Cir.1963)).
In the context of the Stark Law, it is easy to see how even diligent counsel could wind up giving clients incorrect advice. Between the law’s being amended to have a broader scope but then narrowed with various exceptions, along with the promulgation and amendment of copious associated rules and regulations, “the Stark Law bec[ame] a classic example of a moving target. For lawyers, who must depend on the predictability of the law when they give counsel to their clients, such unpredictability [i]s an unusually heavy burden.” Wales, supra at 21.
In this case, there can be no doubt that Tuomey sought and followed the advice of its long-time counsel, Nexsen Pruet. Nexsen Pruet drafted and approved the contracts at the heart of this litigation. Tuomey and Nexsen Pruet consulted with others, including the nation’s largest healthcare law firm and a national consulting firm with expertise in physician compensation. Those experts, too, signed off on the arrangements (though the parties dispute whether Tuomey had shared all pertinent information for purposes of these additional assessments).
Nevertheless, as the majority opinion notes, “a reasonable jury could have concluded that Tuomey was ... no longer acting in good faith reliance on the advice of its counsel when it refused to give full consideration to McAnaney’s negative assessment of the” contracts. Id. at 32. As already explained, McAnaney, the former Chief of the Industry Guidance Branch at the Department of Health and Human Services’ Office of Counsel to the Inspector General, also served as Tuomey’s counsel. And he advised Tuomey that the proposed arrangements raised significant red *395 flags and may well be unlawful. Had Tuo-mey followed McAnaney’s advice, it likely would have faced no lawsuit in which to raise an advice of counsel, or any other, defense.
III.
This case is troubling. It seems as if, even for well-intentioned health care providers, the Stark Law has become a booby trap rigged with strict liability and potentially ruinous exposure — especially when coupled with the False Claims Act. Yet, the district court did not abuse its discretion when it granted a new trial and the jury did not act irrationally when it determined that Tuomey violated both the Stark Law and the False Claims Act. Accordingly, I must concur in the outcome reached by the majority.