# United States Court of Appeals
## For the First Circuit

Nos. 08-2319, 08-2320

CARMEN L. RODRÍGUEZ-GARCÍA,

Plaintiff, Appellee, Cross-Appellant,

v.

WILLIAM MIRANDA-MARÍN, MUNICIPALITY OF CAGUAS,

Defendants, Appellants, Cross-Appellees,

WILFREDO PUIG,

Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Bruce J. McGiverin, U.S. Magistrate Judge]

Before
Lipez, Baldock[*] and Howard,
Circuit Judges.

Luis Pabón-Roca, with whom Grisselle González-Negrón and Faccio & Pabón-Roca were on brief, for the Municipality of Caguas.
José Enrico Valenzuela-Alvarado, Assistant Solicitor General, with whom Irene S. Soroeta-Kodesh, Solicitor General, Leticia Casalduc-Rabell, Deputy Solicitor General, and Zaira Z. Girón-Anadón, Deputy Solicitor General, were on brief, for William Miranda-Marín.
Godwin Aldarondo-Girald for Carmen L. Rodríguez-García.

June 21, 2010

---

[*]Of the Tenth Circuit, sitting by designation.

**LIPEZ**, **Circuit Judge**. Carmen Rodríguez-García, a career employee of the Municipality of Caguas, brought suit against Mayor William Miranda-Marín, Vice Mayor Wilfredo Puig, and the municipality, alleging violations of the First Amendment and Puerto Rico law. She claimed, inter alia, that she was transferred from her position in the Public Works Department ("Public Works")[1] to the Office of Federal Funds ("Federal Funds") in retaliation for testimony she gave before the Puerto Rico Government Ethics Office. In a prior appeal, we affirmed a jury verdict in favor of Puig, but remanded for a new trial against Miranda-Marín and the municipality. Rodríguez-García v. Municipality of Caguas ("Rodríguez II"), 495 F.3d 1 (1st Cir. 2007).[2] On remand, a magistrate judge presided over the trial by the consent of the parties, see 28 U.S.C. § 636(c), and the jury found in Rodríguez-García's favor and awarded her $350,000 in compensatory damages.

Miranda-Marín and the municipality appeal from the judgment and the denial of several of their post-trial motions.

---

[1] The title of this department (in Spanish, "Departamento de Limpieza, Ornato y Urbanismo") has been variously translated by the parties as "Beautification," "Ornate," "Cleaning, Beautification and Urbanism," and "Public Works." We will refer to it as Public Works.

[2] This is actually the third time this case has come before us. Initially, the district court granted summary judgment for defendants on the ground that Rodríguez-García's claims were time-barred. We vacated that decision and remanded the case for further proceedings. See Rodríguez-García v. Municipality of Caguas, 354 F.3d 91, 100 (1st Cir. 2004) (Rodríguez I).

-2-

Rodríguez-García cross-appeals from the grant of defendants' post-trial motion to alter or amend the judgment, which had the effect of preventing the recovery of double damages pursuant to a provision of Puerto Rico law. We affirm in all respects.

**I.**

**A. Factual Background**

For the purpose of background, we recite here some of the relevant facts in the light most favorable to the jury verdict. <u>Visible Sys. Corp.</u> v. <u>Unisys Corp.</u>, 551 F.3d 65, 69 (1st Cir. 2008).[3] We recount the trial evidence in more detail when we analyze defendants' challenge to the sufficiency of the evidence.

1. Transfer

Rodríguez-García served as an executive secretary to Luisa Flores, director of Public Works, from 1998 until her transfer in 2000. In the course of processing incoming mail, Rodríguez-García noticed that Flores was receiving tickets to political fundraisers and invitations to meetings for the Popular Democratic Party ("PDP"), the party to which the mayor and Flores belonged. Rodríguez-García was concerned that the receipt of this material violated ethics rules prohibiting the use of government resources to further political campaigns. Nevertheless, she duly logged the materials and delivered them to Flores.

---

[3] The facts of this case substantially overlap with the facts recounted in <u>Rodríguez II</u>. Where appropriate, we borrow verbatim from our previous recitation of the facts and procedural history.

-3-

On two occasions in 1999, Rodríguez-García raised her concerns with Flores about the receipt of political materials in the office. Flores ignored her complaints and continued to receive political materials; sometimes, she stapled political fundraiser tickets to office employees' paychecks. Rodríguez-García next raised her concerns with Roberto Carrasquillo, a distant relative and municipal assemblyman for the Puerto Rican Independence Party ("PIP"). Carrasquillo confirmed the merits of her concerns and reported the matter to the Puerto Rico Government Ethics Office. Carrasquillo also denounced the complained-of practice in press releases, newspaper columns, and media interviews.

On December 21, 1999, Rodríguez-García was summoned to appear before the Ethics Office, where she provided sworn testimony regarding her complaint. As part of its investigation, the Ethics Office issued summonses to a number of other municipal employees, including Flores, who notified Mayor Miranda-Marín that she had been summoned.

On February 1, 2000, Flores had a discussion with Rodríguez-García, unrelated to the Ethics Office investigation, about the assignment of a particular job task. Rodríguez-García left the office upset and did not come to work the following day. When she returned on February 3, she had a heated discussion with Flores about the missed day of work. Shortly after that discussion, Rodríguez-García fainted and required medical

treatment.[4]  On the recommendation of her doctor, she rested at home for several weeks.  On February 18, she delivered a copy of her medical release to Human Resources and then met with Vice Mayor Puig to discuss her absence and planned return to work.  She returned to work several days later, on February 21 or 22.

On the morning of her return, Rodríguez-García called Puig's office to explain that she was back at the Public Works office.  She was instructed to leave Public Works and report to Human Resources, where she was informed that she would be transferred to another department.  After initial assignment to the Education Department, which had no work or space for her, Rodríguez-García was transferred to Federal Funds.  She had not requested a transfer and asked to return to her position in Public Works.  Although Rodríguez-García retained the same job title and salary in Federal Funds, her job responsibilities were significantly reduced.

2. Attempted Reinstatement

On March 3, 2000, Rodríguez-García wrote a letter to Human Resources requesting a written explanation for her transfer.[5] In the months that followed, her attorney, Eladio Cartagena, wrote

_____

[4] Medical testimony at trial revealed that Rodríguez-García had a history of depression and other psychological ailments and had been prescribed a variety of medications.

[5] Rodríguez-García hand-delivered her letter to Human Resources and the office of the vice mayor.

three letters on her behalf to Mayor Miranda-Marín, who had the final authority to transfer and reinstate municipal employees. Cartagena's first letter to the mayor, dated March 8, requested Rodríguez-García's reinstatement to Public Works and suggested that her transfer was motivated by the Ethics Office complaint. Cartagena received a reply from Human Resources dated March 27 that began, "The Hon. William Miranda Marín, Mayor, has referred to us your letter dated March 8, 2000 concerning the transfer of Mrs. [Rodríguez-García]." The letter stated that the transfer had been made at Rodríguez-García's request, that it was considered a temporary transfer, and that "we would have no inconvenience in newly reinstating Mrs. [Rodríguez-García] to her former position" in Public Works.

Cartagena sent a second letter to the mayor on April 10 requesting the offered reinstatement. A copy of the letter was also sent to Heriberto Martínez, director of the Legal Advisor's Office. In a conversation on April 10, Martínez informed Cartagena that Rodríguez-García's reinstatement was pending and there would be a meeting between the personnel department and Rodríguez-García's supervisor in Public Works, Flores. Cartagena sent a third letter to Miranda-Marín dated May 31, informing him that, on the basis of the offered reinstatement, Rodríguez-García had met with the interim Human Resources director and the director of Public Works and they had refused to reinstate her. The May 31

letter further notified the mayor of Rodríguez-García's intention to file a civil action based on the retaliatory transfer and refusal to reinstate her.

Later that year, in September 2000, Rodríguez-García happened upon Mayor Miranda-Marín in a public square. She approached him, grabbed his arm, shook him, and asked about her case. He asked what was happening to her. Before she could elaborate, she was escorted away by his assistants.

In October 2000, Rodríguez-García filed a petition against the municipality and Flores in the Superior Court of Puerto Rico.[6] Cartagena spoke to the press about the suit, explaining Rodríguez-García's allegations that she had been unlawfully transferred in retaliation for her Ethics Office complaint. Miranda-Marín responded to Rodríguez-García's claims in a television interview.

On June 27, 2001, Rodríguez-García wrote to Miranda-Marín a final time, complaining that she lacked significant work responsibilities and was depressed. She entreated him to resolve her complaint and reinstate her to her former position. She was never reinstated to her position at Public Works. She remained in

---

[6] The petition was subsequently amended to include a political discrimination claim; the amended petition did not include Flores as a defendant as she had died in the interim. Rodríguez-García later filed and was granted a voluntary dismissal of the petition without prejudice.

her position at Federal Funds until sometime in 2003, when she was transferred to the Department of Building Conservation.

## B. Procedural History

On November 7, 2001, Rodríguez-García filed this action in federal court against the municipality, Mayor Miranda-Marín, and Vice Mayor Puig. She alleged that the defendants transferred and refused to reinstate her because of her political affiliation and in retaliation for her testimony before the Ethics Office, in violation of the First Amendment and Puerto Rico law. She brought her federal law claims pursuant to 42 U.S.C. §§ 1981, 1983 and 1985.

In August 2004, the district court granted partial summary judgment to defendants, dismissing Rodríguez-García's political discrimination claim and her claims under §§ 1981 and 1985. In December 2004, Rodríguez-García proceeded to trial on her surviving retaliation claim. In a pretrial evidentiary ruling, the court ruled that Cartagena's March 8, April 10 and May 31 letters to the mayor, and the March 27 letter in response, could be offered as evidence only for the limited purpose "of negating defendants' contention that plaintiff herself requested a transfer," and not as evidence of the mayor's knowledge of Rodríguez-García's claim. At the close of Rodríguez-García's case, the court granted judgment as a matter of law to Miranda-Marín in his personal capacity under Federal Rule of Civil Procedure 50(a), concluding that the

remaining evidence was insufficient as a matter of law to establish that the mayor knew of Rodríguez-García's employment situation, and therefore he could not be held personally liable for her transfer or nonreinstatement.

At the trial's conclusion, the jury found in favor of Puig, rejecting Rodríguez-García's claim that the vice mayor had taken an adverse employment action against her. However, the jury found that she had established municipal liability for that adverse employment action and awarded her $285,000 in damages. The court granted the municipality judgment as a matter of law under Federal Rule of Civil Procedure 50(b), finding the verdict inconsistent with Rodríguez-García's theory at trial that municipal liability derived from Puig's retaliatory acts.[7]

On appeal, we affirmed the jury verdict in favor of Puig, but held that the court erred in dismissing the case against Miranda-Marín based on its erroneous limitation on the use of the letters between attorney Cartagena and the mayor. Rodríguez II, 495 F.3d at 14. As we explained, if the letters had been correctly admitted as evidence of his knowledge of Rodríguez-García's complaint and the mayor's personal involvement in addressing it, "she would have had a basis for arguing that the mayor knew about

---

[7] The court noted that Rodríguez-García had also pursued a theory of municipal liability based on Miranda-Marín's conduct, but that the court had dismissed the claims against the mayor on his Rule 50(a) motion.

-9-

and was directly involved in the disposition of her transfer and the failure to remedy it." Id. at 13. We therefore granted Rodríguez-García's request for a new trial against the mayor and, because municipal liability could be premised on the mayor's liability, against the municipality as well. Id. at 14.

Prior to the start of the second trial, Miranda-Marín and the municipality (hereafter, "defendants") filed a motion in limine requesting that the jury be instructed that Puig took no adverse employment action against Rodríguez-García, based on the jury verdict in the first trial. The court denied the motion. Defendants also filed a motion in limine arguing that Rodríguez-García should be barred from presenting a claim under Puerto Rico Law 115, P.R. Laws Ann. tit. 29, § 194a, because, inter alia, she had waived that claim by not pursuing it in the first trial. Law 115, which prohibits discrimination against employees for offering testimony before a legislative, administrative or judicial forum, provides that "[t]he employer's liability regarding the damages and the unearned salaries shall be double the amount determined as having caused the violation" of this provision. P.R. Laws Ann. tit. 29, § 194a(a), (b). The court denied the motion, concluding that Rodríguez-García could proceed to trial on her Law 115 claim.

At the close of Rodríguez-García's case, defendants moved for judgment as a matter of law under Rule 50(a), which the court denied. The jury returned a verdict in her favor against both the

mayor and the municipality and awarded Rodríguez-García $350,000 in compensatory damages for emotional pain and suffering.  The court doubled the damages award pursuant to Law 115, issuing a judgment against defendants in the amount of $700,000.

In post-trial motions, defendants challenged both the verdict and the damages award.  Defendants filed a renewed motion for judgment as a matter of law under Rule 50(b), contending that the evidence was insufficient to support a finding of liability as to either the mayor or the municipality.  Defendants also moved for a new trial and for remittitur of the damages award under Federal Rule of Civil Procedure 59, contending that the court erred in refusing to give the requested jury instruction as to Puig and that the $350,000 damages award was excessive.  Finally, defendants moved to alter or amend the judgment under Rule 59(e) on the ground that Rodríguez-García had waived her Law 115 claim and therefore the court should not have doubled the jury award.[8]

The court denied defendants' motions for judgment as a matter of law, a new trial, and remittitur, but granted their motion under Rule 59(e) on the ground that Rodríguez-García had

---

[8] Defendants' motion for a new trial under Rule 59 focused on the requested jury instruction and the damages award.  Although the motion contained a conclusory statement that the verdict was against the weight of the evidence, it made no argument on this point. Accordingly, the trial court treated defendants' motion for judgment as a matter of law as raising a challenge to the sufficiency of the evidence, and their motion for a new trial as raising challenges to the damages award and the court's refusal to give the requested jury instruction.

waived her Law 115 claim. Accordingly, it entered an amended judgment in the amount of $350,000.

Miranda-Marín and the municipality appeal, contending that (1) the evidence was insufficient to support the finding of liability, (2) the court erred in failing to give the requested jury instruction as to Puig, and (3) the damages award was grossly excessive. As a result, defendants argue, the court erred in denying their motions under Rules 50(b) and 59 for judgment as a matter of law, a new trial, and remittitur. Rodríguez-García cross-appeals, contending that she did not waive her Law 115 claim and therefore the court erred in granting defendants' Rule 59(e) motion to amend the judgment.

**II.**

**A. Standard of Review**

We review the denial of a renewed motion for judgment as a matter of law de novo as to questions of law. Valentín-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 95 (1st Cir. 2006). As to matters of fact, we view the evidence "in the light most favorable to the verdict, making no determinations of our own as to the credibility of witnesses or the weight of the evidence, reversing only if a reasonable person could not have reached the conclusion of the jury." Id. at 95-96 (internal quotation marks and citation omitted). We review the denial of a motion for a new trial for abuse of discretion. Jennings v. Jones, 587 F.3d 430,

-12-

436-37 & n.7 (1st Cir. 2009).  The district court "has the power and duty to order a new trial whenever, in its judgment, the action is required in order to prevent injustice." Id. at 436 (quotation marks and citation omitted).  We likewise review the denial of a motion for remittitur for abuse of discretion, reversing only if "the jury's verdict exceeds any rational appraisal or estimate of the damages that could be based on the evidence before the jury." Astro-Med, Inc. v. Nihon Kohden America, Inc., 591 F.3d 1, 13 (1st Cir. 2009) (internal quotation marks and citation omitted).

## B. Sufficiency of the Evidence

Defendants contend that the court erred in concluding that there was sufficient evidence to sustain the jury's finding that defendants retaliated against her for speaking out against the receipt of political materials in her office.[9]

"Public employees do not lose their First Amendment rights to speak on matters of public concern simply because they are public employees." Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007).  Instead, "[t]he First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to

---

[9] Such a violation of First Amendment rights by a state actor is actionable under section 1983, which imposes liability on any person who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983.

-13-

believe and associate, or to not believe and not associate." <u>Rutan</u> v. <u>Repub. Party of Ill.</u>, 497 U.S. 62, 76 (1990). We have articulated a three-part test for determining whether a challenged employment action violated a public employee's First Amendment right to freedom of speech. First, the court examines "'whether the employee spoke as a citizen on a matter of public concern.'" <u>Curran</u>, 509 F.3d at 45 (quoting <u>Garcetti</u> v. <u>Ceballos</u>, 547 U.S. 410, 418 (2006)). Second, the court must "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." <u>Id.</u> at 44 (quoting <u>Pickering</u> v. <u>Bd. of Educ.</u>, 391 U.S. 563, 568 (1968)). Third, the employee must "show that the protected expression was a substantial or motivating factor in the adverse employment decision." <u>Id.</u> at 45. If the employee demonstrates that the speech was a substantial or motivating factor in the employer's retaliatory action, the employer may avoid liability by showing that it would have reached the same decision even absent the protected conduct. <u>Id.</u> This is the so-called <u>Mt. Healthy</u> defense. <u>See</u> <u>Mt. Healthy City Sch. Dist. Bd. of Educ.</u> v. <u>Doyle</u>, 429 U.S. 274, 287 (1977).

Defendants primarily contend that the evidence presented at trial is insufficient to support the jury finding that (1) Rodríguez-García suffered an adverse employment action sufficient

-14-

to support her § 1983 claim, (2) defendants would not have taken the same adverse employment action in the absence of her protected conduct, (3) the mayor is personally liable for retaliation under § 1983, and (4) the municipality is liable under § 1983. We address each challenge in turn.[10]

1. Adverse Employment Action

Actions short of dismissal or demotion, including denials of promotions, transfers, and failures to recall after layoff, can constitute adverse employment actions. Rutan, 497 U.S. at 75; see also Morales-Tañón v. P.R. Elec. Power Auth., 524 F.3d 15, 19 (1st Cir. 2008). Employment actions are sufficiently adverse to support a First Amendment § 1983 claim "if those actions, objectively evaluated, would 'place substantial pressure on even one of thick skin to conform to the prevailing political view.'" Bergeron v.

---

[10] Defendants also claim that Rodríguez-García's sworn testimony before the Ethics Office does not constitute speech on a "matter of public concern," see Connick v. Myers, 461 U.S. 138, 146 (1983), because Carrasquillo, not Rodríguez-García, initiated the complaint with the Ethics Office. Defendants did not raise this argument in the district court, in either their Rule 50(a) or 50(b) motions, and it is therefore waived. See Parker v. Gerrish, 547 F.3d 1, 12 (1st Cir. 2008) (issue is waived on appeal if not pressed in Rule 50 motion). Defendants also direct our attention to Garcetti, in which the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. However, defendants make no effort to explain how Garcetti applies, if at all, to the facts of this case, and we thus deem this argument waived for lack of appellate development. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

-15-

Cabral, 560 F.3d 1, 8 (1st Cir. 2009) (quoting Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218 (1st Cir. 1989) (en banc)), abrogated on other grounds by Maldonado v. Fontanes, 568 F.3d 263 (1st Cir. 2009). This standard is met "when the employer's challenged actions result in a work situation 'unreasonably inferior' to the norm for the position." Agosto-de-Feliciano, 889 F.2d at 1218; see also id. at 1218, 1220 (explaining that factfinder must "canvass the specific ways in which the plaintiff's job has changed" and "determine whether the employee has retained duties, perquisites and a working environment appropriate for his or her rank and title").

Emphasizing that Rodríguez-García did not receive a reduction in salary or change in job title when she was transferred to Federal Funds, defendants contend that the evidence does not support a finding that her transfer and nonreinstatement amounted to an adverse employment action. We disagree. Although she retained the same job title and salary after her transfer to Federal Funds, her job duties and working environment were substantially altered. In Public Works, a large, active office, Rodríguez-García had a variety of job responsibilities including logging incoming mail, maintaining the director's schedule, organizing files, taking dictation, creating letters, and working with other departments on human resources and administrative matters. After her transfer to Federal Funds, a small office that

already had an executive secretary, Rodríguez-García had few tasks assigned to her. Although she occasionally scanned the newspaper for announcements of Federal Funds proposals, opened incoming mail, made photocopies, or answered the phone if the other executive secretary was absent, she spent most of her time doing nothing. She could not assist in many office tasks, such as performing Internet searches and taking dictation in English, because she was not proficient in English, and she could not compete for employment awards or bonuses because she performed few job duties. In addition, she was assigned to work in a windowless storage area alongside cleaning materials and inactive files. A reasonable jury could conclude that these assignments and working conditions were unreasonably inferior to the norm for Rodríguez-García's position of executive secretary.[11]

### 2. Mt. Healthy Defense

Defendants do not contend that Rodríguez-García failed to establish that her protected conduct was a substantial or motivating factor in the adverse employment decision. Instead, they argue that no reasonable jury could have rejected their Mt. Healthy affirmative defense. A defendant seeking the protection of

---

[11] Defendants also suggest, based largely on the testimony of the director of Federal Funds, Gilberto Charriez, that Rodríguez-García performed many job tasks in Federal Funds and seemed happy in her position there. However, the jury was free to credit Rodríguez-García's description of her working conditions and reject Charriez's conflicting testimony.

the Mt. Healthy defense bears the burden of persuasion "to prove by a preponderance of the evidence that the adverse employment action would have been taken 'even in the absence of the protected conduct.'" Guilloty Perez v. Pierluisi, 339 F.3d 43, 56 (1st Cir. 2003) (quoting Mt. Healthy, 429 U.S. at 287). Thus, even if the defendant's actions were motivated in part by the plaintiff's protected conduct, the defendant can still prevail if he or she can show that the protected conduct was not the "but-for" cause of the adverse action. Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 81 (1st Cir. 2006).

Defendants argue that the evidence conclusively established that Rodríguez-García would have been transferred even absent her involvement in the Ethics Office investigation. Their Mt. Healthy defense relies primarily on testimony from Vice Mayor Puig. Puig testified that in early February 2002, Rodríguez-García came to his office distraught and informed him that she had had a heated argument with Flores and did not want to return to Public Works and that, for health reasons, her doctor had recommended that she be transferred out of that department. Puig further testified that he then arranged for her transfer to accommodate this request.

Rodríguez-García presented a different account of her transfer. She testified at trial that she had not requested the transfer, her doctor had not recommended it for health reasons, and she preferred to stay in her position in Public Works. She also

-18-

offered the letters she and her attorney had sent to Human Resources and Mayor Miranda-Marín shortly after her transfer, which sought an explanation for the transfer and requested reinstatement to her position in Public Works. Given this conflicting evidence, a reasonable jury could find that Rodríguez-García's testimony before the Ethics Office, and not her purported transfer request, was the but-for cause of the transfer.[12] We conclude that the jury could reasonably reject defendants' Mt. Healthy defense.[13]

### 3. Personal Liability of Mayor Miranda-Marín

Although government officials "'may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior,'" Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009)), officials may be held liable "if the plaintiff can

---

[12] In addition, there is no evidence indicating that Rodríguez-García's repeated requests for reinstatement between February 2000 and 2003 would have been refused even in the absence of her protected conduct.

[13] Defendants also suggest that, under the second prong of our test outlined above, the First Amendment interests in this case are outweighed by a legitimate government interest in curtailing plaintiff's speech. See Pickering, 391 U.S. at 568. However, instead of addressing the nature of Rodríguez-García's speech and why they had legitimate interests in curtailing it, defendants simply reiterate their contention that Rodríguez-García was transferred at her own request rather than in retaliation for her Ethics Office complaint. This contention relates to defendants' motivation for the adverse employment action, not to the balancing of employee speech and government interests. To the extent that defendants intend to raise a distinct argument under Pickering, it is deemed waived for lack of appellate development. Zannino, 895 F.2d at 17.

establish that her constitutional injury resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization," Rodríquez II, 495 F.3d at 10 (internal quotation marks and citation omitted). Under either a direct or indirect theory of liability, "the plaintiff must show that the official had actual or constructive notice of the constitutional violation." Id. (citing Lipsett v. Univ. of P.R., 864 F.2d 881, 902 (1st Cir. 1988) ("An important factor in making the determination of liability is whether the official was put on some kind of notice of the alleged violations, for one cannot make a 'deliberate' or 'conscious' choice to act or not to act unless confronted with a problem that requires the taking of affirmative steps.")).

Defendants maintain that the mayor cannot be held personally liable because he knew nothing about Rodríguez-García's Ethics Office complaint, her claim that she was transferred in retaliation for that complaint, or her request for reinstatement until after this action was filed in federal court. However, ample evidence supports a finding to the contrary. The jury heard evidence that Rodríguez-García's attorney sent at least three letters to Miranda-Marín regarding her transfer and request for reinstatement, dated March 8, April 19, and May 31, 2000. Human Resources responded to the March 8 letter, stating that the letter had been referred by the mayor and that Rodríguez-García would be

-20-

reinstated.  In addition, Rodríguez-García herself sent a letter to the mayor dated June 27, 2001, again complaining of her transfer and requesting reinstatement.  Defendants insist that the mayor never personally received any of these letters, pointing to evidence that correspondence addressed to the mayor was routinely diverted to the appropriate municipal office or department before reaching him.  However, as we determined in Rodríguez II, whether the mayor personally received the letters sent to him is "a factual question appropriate for jury determination," id. at 13, and here the jury heard the evidence and rejected the mayor's claim of lack of notice.

Furthermore, apart from Rodríguez-García's letters to the mayor, the record contains additional evidence that the mayor was aware of the Ethics Office investigation, her claim of retaliatory transfer, and her request for reinstatement.  Sometime after Rodríguez-García testified before the Ethics Office in December 1999, Flores informed Miranda-Marín that she had been summoned by the Ethics Office, and the mayor offered to help her secure legal representation.  In September 2000, Rodríguez-García confronted the mayor in a public square, grabbed him, and asked what he intended to do about her case.  In October 2000, Rodríguez-García filed a lawsuit against the municipality in Superior Court, alleging that her transfer and nonreinstatement were in retaliation for her Ethics Office complaint.  Shortly thereafter, the mayor commented

-21-

on Rodríguez-García's lawsuit in a television interview.[14] Although the mayor testified at trial that he remained unaware of Rodríguez-García's employment situation or the subject of her complaint despite these events, the jury was free to reject that testimony.

Thus presented, the evidence adduced at trial is sufficient to sustain the imposition of § 1983 liability on the mayor for his own direct acts or omissions with respect to Rodríguez-García's nonreinstatement. See id. A reasonable jury could find that Miranda-Marín had knowledge of the Ethics Office investigation, had knowledge of Rodríguez-García's claim that she was transferred and deprived of duties in retaliation for her testimony before the Ethics Office, and received her repeated requests for reinstatement. Moreover, as mayor, Miranda-Marín had final authority over transfers and reinstatements of municipal employees. Nevertheless, the mayor declined to reinstate Rodríguez-García to her position in Public Works in response to her repeated requests.

4. Liability of the Municipality

As with government officials, a municipality cannot be held liable for the constitutional violations of municipal employees on a respondeat superior theory. Monell v. Dep't of Soc.

---

[14] Miranda-Marín asserted that the lawsuit was part of a scheme by Rodríguez-García's lawyer, who had appeared in an earlier political commercial against the mayor, and that Rodríguez-García was related to Carrasquillo, who allegedly had a personal agenda against the mayor.

<u>Servs.</u>, 436 U.S. 658, 691 (1978).  Instead, liability attaches to a municipality under § 1983 "only if the violation occurs pursuant to an official policy or custom."  <u>Welch</u> v. <u>Ciampa</u>, 542 F.3d 927, 941 (1st Cir. 2008).  A plaintiff can establish an official policy "by showing that the alleged constitutional injury was caused by . . . a person with final policymaking authority."  <u>Id.</u>; <u>see also</u> <u>Rodríguez II</u>, 495 F.3d at 13 ("It is well established that the deliberate acts or omissions of a municipal policymaker with final authority over the subject matter in question may expose the municipality itself to liability.").  Although liability may not be imposed on a municipality for a single instance of misconduct by an official <u>without</u> final policymaking authority, liability may be imposed on a municipality for "a single decision by a final policymaker."  <u>Welch</u>, 542 F.3d at 942 (citing <u>Pembaur</u> v. <u>City of Cincinnati</u>, 475 U.S. 469, 480 (1986)).[15]

We have recognized on a number of occasions that "mayors in Puerto Rico are the government officials ultimately responsible for employment decisions of the municipality." <u>Rodríguez II</u>, 495 F.3d at 13 (quotation marks and citations omitted); <u>see also</u> <u>Acevedo-Garcia</u> v. <u>Monroig</u>, 351 F.3d 547, 553 n.1 (1st Cir. 2003) (noting that under Puerto Rico law, mayors of municipalities have

---

[15] Relying on our decision in <u>Fabiano</u> v. <u>Hopkins</u>, 352 F.3d 447 (1st Cir. 2003), defendants suggest that a single incident of misconduct cannot expose a municipality to § 1983 liability.  We squarely rejected this same argument in <u>Welch</u>.  <u>See</u> 542 F.3d at 942.

the power to appoint and remove municipal officials and employees, and thus mayor's "employment decisions ipso facto constituted the official policy of the municipality" (internal quotation marks and citation omitted)).  Therefore, liability can be imposed on the municipality for Miranda-Marín's own direct acts or omissions with respect to Rodríguez-García.[16]

## C. Requested Jury Instruction as to Vice Mayor Puig

Recounting what happened in the first jury trial in this case, defendants contend that the court erroneously declined to instruct the jury in the second trial that Vice Mayor Puig had not taken an adverse employment action against Rodríguez-García. Following that first trial, in which Puig and the municipality were defendants, the jury rejected Rodríguez-García's claim that the vice mayor had taken an adverse employment action against her. Presented with a special jury verdict form that asked, "Did Plaintiff establish by preponderance of the evidence that defendant Wilfredo Puig took adverse employment action against her?", the jury answered in the negative.  Prior to the second trial, defendants Miranda-Marín and the municipality invoked collateral

_____

[16] Defendants further contend that the mayor is entitled to qualified immunity because he did not cause any violation of a constitutional right. In support of this position, defendants simply reiterate their contentions that Rodríguez-García was transferred based on her own request and not in retaliation for her Ethics Office testimony and that the mayor had no knowledge of her transfer and request for reinstatement. As discussed above, ample evidence supports a jury finding to the contrary on both of these points.

estoppel and moved that the court instruct the jury that Puig took no adverse employment action against Rodríguez-García. The court denied the motion in limine in a thorough written order, concluding that the requested instruction would likely confuse and unduly influence the jury and would not promote judicial economy because closely related issues remaining in the case would require that much of the same evidence be presented to the jury.

Collateral estoppel, now often called issue preclusion, prevents a party from relitigating issues that have been previously adjudicated. Enica v. Principi, 544 F.3d 328, 336 (1st Cir. 2008). The doctrine serves the twin goals of "protecting litigants from the burden of relitigating an identical issue" and "promoting judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979). Collateral estoppel may be applied where "(1) the issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment." Ramallo Bros. Printing, Inc. v. El Dia, Inc., 490 F.3d 86 (1st Cir. 2007).

In the past, courts "adhered to the doctrine of 'mutuality of estoppel,' which ordained that 'unless both parties (or their privies) in a second action are bound by a judgment in a previous case, neither party (nor his privy) in the second action

-25-

may use the prior judgment as determinative of an issue in a second action.'" Acevedo-Garcia, 351 F.3d at 573 (quoting Blonder-Tongue Labs. v. Univ. of Ill. Found., 402 U.S. 313, 320-21 (1971)). However, mutuality is no longer strictly required for the application of collateral estoppel in federal courts. Fiumara v. Fireman's Fund Ins. Cos., 746 F.2d 87, 92 (1st Cir. 1984). Instead, the central question is "whether a party has had a full and fair opportunity for judicial resolution of the same issue." Id. Nonmutual collateral estoppel may be invoked either offensively, by a plaintiff who "seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party," or, as in this case, defensively, by a defendant who "seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." Parklane Hosiery, 439 U.S. at 326 n.4; see id. at 329-32. We have also recognized that collateral estoppel is "no longer limited to ultimate issues: necessary intermediate findings can now be used to preclude relitigation." Biggins v. Hazen Paper Co., 111 F.3d 205, 210 (1st Cir. 1997); see also Restatement (Second) of Judgments § 27, cmt. j (1982).

Rodríguez-García makes two arguments in support of the court's decision not to apply collateral estoppel. First, she argues that collateral estoppel cannot be applied in this case because the parties in the two proceedings were not identical.

-26-

This argument is foreclosed by the precedent permitting defensive nonmutual collateral estoppel. Second, Rodríguez-García argues that the issue litigated and decided in the first trial, whether Vice Mayor Puig took an adverse employment action against her, is not the same as the issue to be decided in the second trial, whether Mayor Miranda-Marín is personally liable for the alleged retaliation.

As we explained in Rodríguez II, Miranda-Marín could be held liable either based on his own "direct acts or omissions," that is, his direct participation in the unconstitutional conduct, or based on his indirect "condonation or tacit authorization" of unconstitutional conduct by his subordinates. 495 F.3d at 10 (internal quotation marks omitted); see also Whitfield v. Meléndez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005). A finding of liability under the former theory, that Miranda-Marín directly participated in the refusal to reinstate Rodriguez-Garcia, would not depend in any way on whether the vice mayor took an adverse employment action against her. However, a finding of liability under the latter theory, that Miranda-Marín condoned or tacitly authorized an adverse employment action taken by a subordinate such as Vice Mayor Puig, could require the jury to decide precisely the same issue that was decided by the jury in the first trial -- whether the vice mayor took an adverse employment action against Rodríguez-García.

-27-

Here, although the special verdict form used in the second trial does not indicate whether the jury found Miranda-Marín liable on a direct or indirect theory of liability, we can be reasonably sure that the jury found the mayor liable on a direct liability theory.[17] Rodríguez-García's theory of liability at the second trial was that Miranda-Marín was directly involved in her nonreinstatement, not that the mayor condoned or tacitly authorized any alleged adverse action by Puig. She offered evidence that Miranda-Marín had the ultimate authority to transfer and reinstate municipal employees, knew that she had been transferred in retaliation for her Ethics Office complaint, knew of her repeated requests for reinstatement, and nevertheless refused to reinstate her. She did not offer any evidence that Puig received her

---

[17] The special verdict form used in the second trial asked the jury whether they found "by a preponderance of the evidence that plaintiff's transfer, or failure to be reinstated, resulted from Mayor William Miranda Marín's direct acts or omissions, or from his indirect conduct that amounted to condonation or tacit authorization." Thus, the verdict form does not indicate whether the jury found the mayor liable on a direct or indirect theory of liability. Where a general verdict or special verdict question encompasses multiple claims or multiple theories of liability, one of which is unsupported by the evidence or otherwise defective, "a new trial is usually warranted." See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 73 (1st Cir. 2009); see also David v. Rennie, 264 F.3d 86, 105-06 (1st Cir. 2001). However, this rule is "by no means rigid;" instead, "we apply a generous harmless error analysis in order to determine whether it is reasonably likely that the jury in fact relied on a theory with adequate evidentiary support." Mass. Eye & Ear, 552 F.3d at 73. Rodríguez-García's evidence and argument at trial focused entirely on a direct rather than an indirect theory of liability. Therefore, it is reasonably likely that the jury relied on a direct theory of liability, a theory amply supported by the evidence.

requests for reinstatement or was involved in the decision not to reinstate her.  As the trial court explained in its order denying defendants' motion for a new trial:

> Defendants overstate the importance of Puig's actions as they relate to plaintiff's theory of the case as it was presented through evidence in the second trial.  . . .  Although there was evidence (elicited mainly by the defendants) that Puig authorized plaintiff's initial transfer in February 2000, no evidence was presented that Puig received any of plaintiff's requests for reinstatement, or that he was involved in any decision not to reinstate her from February 2000 until early 2003; rather, the evidence presented at trial indicated that all such requests were made to Miranda-Marín and were referred to the head of Human Resources.

Rodríguez-García's opening and closing arguments similarly focused on the mayor's direct participation in Rodríguez-García's nonreinstatement, rather than any indirect authorization of alleged adverse actions by Puig.  Thus, a finding of liability under the theory Rodríguez-García pressed at the second trial, that the mayor was directly involved in the decision not to reinstate her, is consistent with the jury verdict in favor of Puig in the first trial.

Moreover, "[n]onmutual issue preclusion is not available as a matter of right."  18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4465 (2d ed. 2010).  Instead, a district court may refuse to apply nonmutual collateral estoppel when, for example, its application "would badly

distort matters" before the jury, Biggins, 111 F.3d at 210 (citing Federal Rule of Evidence 403), or would "not result in efficiency gains because litigation of the 'live' issue may require introduction of some of the same evidence pertinent to the estopped issues," Acevedo-Garcia, 351 F.3d at 577. Although, as defendants point out, Biggins and Acevedo-Garcia involved offensive nonmutual collateral estoppel, concerns about juror confusion and judicial economy are relevant to defensive nonmutual collateral estoppel as well. See 18A Wright, Miller & Cooper, supra, at § 4465 ("Whatever values may be gained by nonmutual preclusion are substantially diminished when the need to try related issues requires consideration of much the same evidence as bears on the issue tendered for preclusion. . . . Beyond the lack of time saving, moreover, preclusion on one issue while closely related issues must be tried may substantially distort decision of the issues that remain open." (footnote omitted)); Restatement (Second) of Judgments § 29(6).

The district court carefully weighed the merits of the requested jury instruction and concluded that it was not appropriate in this case. Citing Federal Rule of Evidence 403, the court found that the requested instruction could lead the jury to make improper inferences as to related issues remaining in the case, such as whether Rodríguez-García's transfer or nonreinstatement constituted an adverse employment action, whether

she was transferred at her own request rather than in retaliation for her protected activity, and whether municipal actors other than the vice mayor took an adverse employment action against her. The court further found that the instruction would not promote judicial economy because these remaining, closely intertwined issues would require introduction of much of the same evidence at trial. In view of the court's well-supported concerns about juror confusion and judicial economy, we conclude that the court did not err in refusing to instruct the jury that Vice Mayor Puig had not taken an adverse employment action against Rodríguez-García.

**D. Damages**

Finally, defendants argue that the trial court erred in declining to reduce the damages award, asserting that the award was grossly excessive. The jury awarded Rodríguez-García $350,000 in compensatory damages for her emotional pain and suffering.

We may overturn a damages award only if it is "grossly excessive or so high as to shock the conscience of this court." Valentín-Almeyda, 447 F.3d at 103. We accord "broad discretion to the trial court's decision to affirm the jury's award of damages because of that court's greater familiarity with local community standards and with the witnesses' demeanor at the trial." Id. (quotation marks and citation omitted). Damages for pain and suffering, in particular, "defy exact mathematical computation and

are not susceptible to proof by a dollar amount." Acevedo-Garcia, 351 F.3d at 571 (internal quotation marks and citations omitted).

At trial, Rodríguez-García and her psychiatrist, Dr. Julio Fontanez, testified at length about the suffering she endured as a result of her transfer and nonreinstatement. Rodríguez-García explained that the lack of duties in her new position made her feel "very bad," "depressed," "like I was nothing, like I wasn't there. . . . I continued being Executive Secretary 1, but I wasn't that. In practice, I wasn't that. And they let me know that everyday, having me there." The transfer affected her home life as well, causing her to "withdr[a]w from my family, from my children, my daily life. From my mother, my family. I wanted to be alone, withdrawn, just thinking. . . . I tried to get away . . . from what was me."

Dr. Fontanez, who treated Rodríguez-García from July 1997 until December 2002, testified that her psychological condition deteriorated over this period. Although Rodríguez-García had typical symptoms of depression as of 1997, over time her condition grew "more acute," requiring increased medication and, beginning in June 2000, repeated hospitalizations. Fontanez testified to Rodríguez-García's recurring complaints about her work situation after the transfer, and identified that situation as an important factor in her deteriorating condition.

In light of this evidence, we cannot say that the court abused its discretion in affirming the damages award.  Although generous, the award of $350,000 was not grossly excessive or so high as to shock the conscience.  Moreover, this award is similar to noneconomic compensatory damages awards we have upheld in other employment discrimination and retaliation contexts.  See, e.g., Monteagudo v. Asociación de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 174-75 (1st Cir. 2009) (upholding $333,000 damages award in sexual harassment case where plaintiff testified that she suffered from depression, cried every evening and was unable to sleep); McDonough v. City of Quincy, 452 F.3d 8, 22 (1st Cir. 2006) (affirming $300,000 damages award in Title VII retaliation case, "the bulk" of which was for emotional distress in the form of humiliation and damage to reputation and family relationships).

## III.

In her cross-appeal, Rodríguez-García contends that the court erred in concluding that she waived her claim under Law 115. Law 115 prohibits an employer from discriminating against an employee for offering testimony before a legislative, administrative or judicial forum in Puerto Rico and, importantly, provides for double damages for a violation of this provision.  29 P.R. Laws Ann. tit. 29, § 194a(a), (b).

Following our decision in Rodríguez II remanding the case for a new trial against the mayor and municipality, Rodríguez-García raised a Law 115 claim in the joint proposed pretrial order ("2007 pretrial order"). Defendants objected, arguing that she had waived this claim by failing to include it in the joint pretrial order filed by the parties and approved by the court prior to the first trial ("2004 pretrial order"). The court concluded that Rodríguez-García could proceed to trial on her Law 115 claim, and it subsequently doubled the $350,000 compensatory damages award pursuant to that provision. However, on defendants' post-judgment motion to alter or amend the judgment under Rule 59(e), the court determined that its prior ruling was in error. In a written order, the court thoroughly analyzed the record and concluded that Rodríguez-García had waived her Law 115 claim by not including it in the 2004 pretrial order or successfully moving to modify the order, and she had not shown any manifest injustice that would result from not permitting her to modify the 2004 pretrial order to include this claim. The court then entered an amended judgment in the amount of $350,000.

We review the court's decision on a Rule 59(e) motion for abuse of discretion. See Negrón-Almeda v. Santiago, 528 F.3d 15, 25 (1st Cir. 2008). A final pretrial order "is intended to 'control the subsequent course of the action,' and can be modified only 'to prevent manifest injustice.'" Correa v. Hosp. San

<u>Francisco</u>, 69 F.3d 1184, 1195 (1st Cir. 1995) (quoting Fed. R. Civ. P. 16(e)). Therefore, "[a]n appellate court should not lightly relieve a litigant from the condign consequences of its failure to list a theory . . . at that critical stage of the proceedings," <u>id.</u>, and "issues not included in the final pretrial order are generally waived," <u>id.</u> (citing <u>Ramirez-Pomales</u> v. <u>Becton Dickinson & Co.</u>, 839 F.2d 1, 3 (1st Cir. 1988)).

As the court explained in its detailed order granting defendants' Rule 59(e) motion, even assuming that Rodríguez-García's complaint adequately raised a Law 115 claim,[18] she waived that claim by failing to include it in the 2004 proceedings. In the 2004 pretrial order, Rodríguez-García raised several claims arising under Puerto Rico law,[19] but did not assert a Law 115 claim and did not request double damages. Defendants noted this omission, stating in the pretrial order that Rodríguez-García had

---

[18] Rodríguez-García's complaint contained one mention of Law 115, invoking supplemental jurisdiction "for causes of action arising under the Puerto Rico Constitution and laws of the Commonwealth of Puerto Rico, among them, Act 115 . . . ." However, the complaint's asserted causes of action included several claims arising under Puerto Rico law, but did not include a claim under Law 115. The complaint's prayer for relief likewise did not request double damages under Law 115, although it generally requested "all damages to which [Rodríguez-García] is entitled."

[19] In the 2004 pretrial order, in addition to her federal law claims, Rodríguez-García asserted claims under Article II, §§ 1, 6 and 7 of the Puerto Rico Constitution; the Puerto Rico Public Service Personnel Act, Act No. 5 of Oct. 14, 1975, P.R. Laws Ann., tit. 3, §§ 1301-1323 (repealed Aug. 3, 2004); and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann., tit. 31, §§ 5141, 5142.

not sought a remedy under Law 115.  Thereafter, Rodríguez-García made no objection to the language of the 2004 pretrial order and did not seek to modify the order prior to the first trial. Furthermore, at the first trial, the court rejected her attempt to proceed under Law 115.  After the close of evidence, Rodríguez-García argued to the court that Law 115's three-year statute of limitations governed the action.  However, defense counsel argued that "this is not a Law 115 case" and opposed any attempt by plaintiff to amend her complaint to include a Law 115 claim.  The court agreed, ruling that "they are not amending their case to be Law 115."[20]

Rodríguez-García takes issue with the trial court's analysis, contending that she did not waive her Law 115 claim prior to the first trial.  She points to statements in the 2004 pretrial order, by the judge during the first trial, and in our opinion in Rodríguez II, that refer to her claims under "state law" or "Puerto Rico law."  See, e.g., Rodríguez II, 495 F.3d at 2, 6.  For example, the court instructed the jury in the first trial that plaintiff's claim "under Puerto Rico law" was "identical for all practical purposes to the federal claim," and if the jury found defendants liable under federal law, they would also be liable

---

[20] The following day, Rodríguez-García objected to the jury instructions, requesting an instruction under Law 115.  The court did not rule on this objection, and Rodríguez-García did not raise the issue again.

under Puerto Rico law.  However, as noted above, the complaint and the 2004 pretrial order expressly included several claims arising under Puerto Rico law.  There is nothing to suggest that the statements Rodríguez-García points to, which refer generally to state or Puerto Rico law, encompassed Law 115.

In sum, we conclude that the court's determination that Rodríguez-García waived her Law 115 claim, and that its earlier ruling to the contrary was erroneous, was not an abuse of discretion.  See Ruiz-Rivera v. Pfizer Pharmaceuticals, LLC, 521 F.3d 76, 81-82 (1st Cir. 2008) (a court may grant a Rule 59(e) motion "where the movant shows a manifest error of law or newly discovered evidence" (quotation marks and citation omitted)).

**IV.**

For the foregoing reasons, the judgment is affirmed. Each party shall be responsible for its own costs.

So ordered.